

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FIDELITY NATIONAL TITLE COMPANY,　)
A CALIFORNIA CORPORATION,　)
SUCCESSOR BY MERGER TO FIDELITY　)
NATIONAL TITLE INSURANCE COMPANY　)
OF NEW YORK,　)
　)
　　　　　　Plaintiff,　)
　)
　　　　v.　)　No. 04 C 6382
　)
LAW TITLE INSURANCE COMPANY, INC.,　)　Judge Rebecca R. Pallmeyer
LAW TITLE INSURANCE COMPANY, INC. -　)
NAPERVILLE, and JOHN F. GINOCCHIO,　)
individually,　)
　)
　　　　　Defendants.　)

## MEMORANDUM OPINION AND ORDER

Plaintiff Fidelity National Title Insurance Company, a California corporation, successor by merger to Fidelity National Title Insurance Company of New York ("Fidelity"), filed suit against Defendants Law Title Insurance Company, Inc. ("Law Title"), Law Title Insurance Company, Inc. - Naperville ("Law Title - Naperville"), and the President of both companies, John F. Ginocchio, seeking to recover approximately $2,000,000 paid by Fidelity on some 32 title insurance policies that were issued by Defendants and underwritten by Fidelity. Defendants have filed several motions challenging Fidelity's Complaint, including a motion to strike, two motions to dismiss, a motion for partial summary judgment, and a motion for a more definite statement. For the reasons set forth below, the motions are granted in part and denied in part.

## BACKGROUND

Fidelity, a California corporation with its principal place of business in California, has issued and underwritten title insurance for real estate in Illinois. (Cmplt. ¶ 1.) Law Title and Law Title - Naperville are Illinois corporations engaged in the sale of title insurance as agents for various title insurance underwriters, including Fidelity. Both companies have offices throughout Illinois, including

in Kane, Kendall, DuPage, DeKalb, Lake, and Cook Counties. (*Id.* ¶¶ 2, 3.) Ginocchio is the President of Law Title and Law Title - Naperville and resides in Princeton, Illinois. (*Id.* ¶ 4.)

## A. The Agency Agreements

On May 16, 1995, Fidelity and Law Title entered into an agency agreement (the "Agreement") in which Fidelity appointed Law Title to act as its agent for purposes of "countersign[ing] and issu[ing] title insurance commitments, binders, guarantees, endorsements, title insurance policies of [Fidelity], or any other form whereby [Fidelity] assumes liability . . . ." (*Id.* ¶¶ 7, 9; Ex. A1 ¶ 1.) Fidelity and Law Title - Naperville entered into a similar agreement (the "Naperville Agreement") on February 1, 1997. (*Id.* ¶¶ 8, 9; Ex. A2 ¶ 1.)

The Agreement and the Naperville Agreement both provide for the allocation of "Losses" – defined as "sums paid or to be paid by [Fidelity], in cash or otherwise, to settle or compromise claims under any of [Fidelity's] Title Assurances issued by [Law Title or Law Title - Naperville]" (*Id.* ¶ 12; Exs. A1 and A2 ¶ 12(A)) – between Fidelity and both Law Title companies (referred to in the agreements as "Agent"). These provisions generally require the Law Title companies to indemnify Fidelity for losses caused by the Law Title companies' own negligence or wrongdoing:

> B. In the event that a Loss sustained or incurred for a matter arising under this Agreement resulted or arose from the negligent, willful or reckless conduct of Agent, Agent's employees or any independent contractor relied upon by Agent, then Agent shall reimburse [Fidelity] for the Loss. The instances where Agent shall be liable to [Fidelity] under this subparagraph shall include, without limitation, the following:
>
> 1. Failure of the Agent to comply with the terms and conditions of this Agreement or with the manuals, underwriting bulletins and/or instructions given to Agent by [Fidelity].
>
> 2. Issuance of Title Assurances which contain errors or omissions which could reasonably have been detected by Agent from the commitment, examiner's report, title search or abstract.
>
> 3. Loss arising from escrow or Non-Title Assurance operations of Agent including, but not limited to, preparation of documents, providing abstracting services, providing accommodation services and the handling and disbursement of funds.

* * * *

2

5.  Commission of fraud, conspiracy, dishonesty, misrepresentation or defalcation by Agent or Agent's aiding and abetting therein.

\* \* \* \*

C.  Agent shall be liable to [Fidelity] for any Loss resulting to [Fidelity] by reason of Agent's failure to comply with the terms and conditions of this Agreement.

(*Id.* ¶ 13; Exs. A1 and A2 ¶ 6.)

### B.   Ginocchio's Personal Guarantees

On February 1, 1997, Ginocchio signed a single-page document attached to the Naperville Agreement setting forth four "Schedules" identified as A through D.  Schedule D is entitled "Personal Guarantee" and states that "each of the undersigned jointly and severally does hereby personally and unconditionally undertake, guarantee and assure the full, prompt and complete performance of all the terms, agreements, covenants, conditions and undertakings of Agent as set forth in said Agency Agreement." (*Id.* ¶ 17; Ex. A2, Schedule D.)  Ginocchio signed a similar document in connection with the Agreement on June 2, 1997. (*Id.* ¶ 16; Ex. A1, Schedule D.)

### C.   Fidelity's Claims

Fidelity asserts four claims against Defendants relating to certain inappropriate underwriting practices that resulted in "Losses" to Fidelity under the Agreement and Naperville Agreement.  The court's jurisdiction over these claims is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

### 1.   The Ron Cook Closings

In Count I of the Complaint, Fidelity alleges that between February and November 2000, Ron Cook, a Title Officer and Salesman for Law Title, closed at least six fraudulent mortgage refinances underwritten by Fidelity (the "Ron Cook Closings").  Fidelity claims that Cook engaged in a scheme to "submit to Law Title forged and fictitious deeds and other false information in order to induce Fidelity, through Law Title, to issue and underwrite title insurance for the Ron Cook Closings." (*Id.* ¶ 21.) Specifically, Cook paid large sums of money from his personal checking account to three individuals: Donna Davis (Loan Officer), Jim Baiocchi (Appraiser/Investor), and Carmondel

3

Muhammad (Investor),[1] who then acted as the purported borrowers at the fraudulent closings. Cook's payments to these "co-conspirators" totaled at least $96,300. (*Id.* ¶¶ 19, 22.) On February 8, 2001, Ginocchio sent a letter to Mike Fonder, Vice-President of Fidelity, disclosing that "[w]e have come across 7 files to date that may involve inappropriate underwriting on the part of our employee, Ron Cook . . . ." (*Id.* ¶ 20; Letter from J. Ginocchio to M. Fonder of 2/8/01, Ex. B to Cmplt.) The letter identified eleven individuals, including Cook, Davis, Baiocchi, and Muhammad, whose names "ke[pt] appearing in" the questioned files, and whom Fidelity believes participated in the fraudulent scheme. (*Id.* ¶ 21; Letter from J. Ginocchio to M. Fonder of 2/8/01, Ex. B.)

Fidelity's insureds from the Ron Cook Closings filed six title insurance claims with Fidelity, resulting in settlement payments totaling $475,631.50. (*Id.* ¶ 24.) Fidelity alleges that Law Title is required to reimburse these amounts pursuant to paragraphs 6(B)(5) and 6(C) of the Agreement "by virtue of Ron Cook's participation in the fraud." (*Id.* ¶ 26.) Fidelity also claims that Ginocchio is personally liable for the losses under his personal guarantee contained in Schedule D of the Agreement. (*Id.* ¶ 29.)

### 2. The Ken Steward Closings

In Count II of the Complaint, Fidelity alleges that between February and November 2001, Ken Steward of either Law Title or Law Title - Naperville[2] conducted at least seven fraudulent closings underwritten by Fidelity (the "Ken Steward Closings"). (*Id.* ¶ 33.) Fidelity learned about the fraudulent scheme from certain unidentified insureds. That scheme allegedly involved "deceptive acts, including but not limited to, the fabrication of mortgage payoff statements at closing and/or forged endorsements on checks generated at the Ken Steward Closings," which "enabled Ken Steward to fraudulently divert funds to himself and away from Fidelity's insureds." (*Id.* ¶ 34.) Fidelity

---

[1]　　The Complaint does not explain the nature of the relationship, if any, between the three individuals and Law Title or Law Title - Naperville.

[2]　　Fidelity asserts Count II alternatively against Law Title and Law Title - Naperville, noting that "it is unclear which entity is responsible for processing the Ken Steward Closings as Fidelity's Agent." (Cmplt. ¶ 33 n.1.) The Complaint does not indicate Steward's official title.

claims that Law Title and/or Law Title - Naperville were negligent with respect to the Ken Steward Closings by "(a) failing to verify that the payoff statements relating to existing mortgage liens on the subject properties were genuine; and/or (b) in tendering payoff checks to Ken Steward for delivery to third parties even though the checks were not made payable to Ken Steward." (*Id.* ¶ 39.)[3]

Fidelity's insureds from the Ken Steward Closings submitted title insurance claims to Fidelity, and Fidelity paid a total of $718,955.65 to clear related title defects. (*Id.* ¶¶ 35-37.) Fidelity alleges that Law Title and/or Law Title - Naperville must reimburse these amounts pursuant to various provisions of the Agreement and/or the Naperville Agreement, including paragraphs 6(B)(1), 6(B)(2), 6(B)(3), and 6(C). (*Id.* ¶ 40.) Fidelity asserts that Law Title and Law Title - Naperville have "admitted that they are liable to Fidelity" for losses relating to the Ken Steward Closings, citing an April 12, 2004 letter from Ginocchio to Paul Cozzi, Fidelity's Vice President/Regional Counsel. (*Id.* ¶ 41.) In that letter, Ginocchio stated:

The Ken Steward Claims:
The demand for $535,073.00 for Law Title files number 124858E, 116403E, 128798E, 127620E and 129726E has also been referred to our E & O [errors and omissions] carrier. Law Title has also filed a law suit against Fifth Third Bank on the fraudulent endorsements contained in each of these files.
It is my opinion that between Fifth Third Bank and our E & O carrier, Fidelity will get its money back on those files. I would ask you to please be patient.

(*Id.*; Letter from J. Ginocchio to P. Cozzi of 4/12/04, Ex. E to Cmplt.) Fidelity also claims that Law Title and/or Law Title - Naperville have become parties to several lawsuits relating to the Ken Steward Closings, and that by "attempt[ing] unsuccessfully to collect [from third parties such as their errors and omissions insurance carrier] the Losses sustained by Fidelity for the Ken Steward Closings," they have "admitt[ed] Law Title's and/or Law Title - Naperville's liability to Fidelity for these Losses." (*Id.* ¶ 42.) As with Count I, Fidelity seeks to hold Ginocchio personally liable for the

---

[3]     The court presumes that payoff checks intended for delivery to third parties would be made payable to those third parties, not to Ken Steward, and is therefore uncertain why Fidelity appears to suggest that the fact that these checks were written to third parties demonstrates that tendering payoff checks to him was (absent some notice of his dishonesty) improper or negligent.

Losses under his personal guarantee contained in Schedule D of the Agreement and the Naperville Agreement. (*Id.* ¶ 44.)

### 3. Miscellaneous ¶ 6(B) Files

Count III of the Complaint alleges that between the summer of 1997 and October 2002, Law Title and/or Law Title - Naperville[4] negligently conducted at least 12 additional closings on behalf of Fidelity (the "Miscellaneous ¶ 6(B) Files"), and that Fidelity is entitled to be reimbursed for its related losses pursuant in part to paragraph 6(B) of the Agreement and/or Naperville Agreement. (*Id.* ¶ 48.) Fidelity learned about the title problems relating to the Miscellaneous ¶ 6(B) Files from certain unidentified insureds. (*Id.* ¶ 49.) The specific problems included: (1) failing to payoff a mortgage lien at closing (Claim Number 73578); (2) failing to note that the borrower had conveyed title to another grantee prior to closing (Claim Number 77981); (3) missing a life estate encumbering the property (Claim Number 82144); (4) failing to promptly record a deed and mortgage, which allowed a subsequently filed judgment lien creditor to take priority over the insured mortgage (Claim Number 110385); and (5) missing a prior tax sale of one of the parcels encumbering the property at the subject closing (Claim Number 117101). (*Id.*)

Fidelity has settled title claims filed by its insureds relating to the Miscellaneous ¶ 6(B) Files, paying a total of $700,177.33. (*Id.* ¶¶ 50-52.) Fidelity alleges that Law Title and/or Law Title - Naperville must reimburse these amounts pursuant to various provisions of the Agreement and/or the Naperville Agreement, including paragraphs 6(B)(1), 6(B)(2), 6(B)(3), and 6(C). (*Id.* ¶ 54.) Fidelity also claims that Ginocchio is personally liable for the Losses under his personal guarantee contained in Schedule D of the Agreement and the Naperville Agreement. (*Id.* ¶ 56.)

---

[4]     Fidelity asserts Count III alternatively against Law Title and Law Title - Naperville, noting that "it is unclear which entity is responsible for processing the Miscellaneous ¶ 6(B) Files as Fidelity's Agent." (Cmplt. ¶ 48 n.2.)

### 4. Miscellaneous ¶ 6(A) General Liability Files

In Count IV of the Complaint, Fidelity alleges that Law Title and/or Law Title - Naperville[5] conducted at least six closings on behalf of Fidelity which involved title defects (the "Miscellaneous ¶ 6(A) General Liability Files"). (*Id.* ¶¶ 60-62.) Fidelity claims that Law Title and/or Law Title - Naperville must reimburse its expenses incurred in clearing the title defects, totaling a minimum of $30,000 (or $5,000 per Loss). (*Id.* ¶ 64; Exs. A1 and A2, Schedule A ("Agent shall be liable for the first $5,000 of any Loss sustained or incurred by [Fidelity] as a result of the issuance of the Title Assurances by Agent.")) Fidelity also seeks to hold Ginocchio personally liable for the Losses under his personal guarantee contained in Schedule D of the Agreement and the Naperville Agreement. (*Id.* ¶ 66.)

## DISCUSSION

Defendants have filed five motions challenging the Complaint: (1) a motion to strike Exhibit E pursuant to FED. R. EVID. 408; (2) a motion to dismiss the claims against Ginocchio; (3) a motion to dismiss Count I pursuant to FED. R. CIV. P. 9(b) and 19(a); (4) a motion for partial summary judgment; and (5) a motion for a more definite statement pursuant to FED. R. CIV. P. 12(e). The court addresses each motion in turn.

### A. Motion to Strike Exhibit E

Defendants seek to strike Ginocchio's April 12, 2004 letter to Paul Cozzi of Fidelity, attached to the Complaint as Exhibit E, on the grounds that it "was written in an attempt to compromise Fidelity's demands" and, thus, is inadmissible under FED. R. EVID. 408. (Motion to Strike ¶ 5.) Rule 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence

---

[5]      Fidelity asserts Count IV alternatively against Law Title and Law Title - Naperville, noting that "it is unclear which entity is responsible for processing [the Miscellaneous ¶ 6(A) General Liability Files] closings as Fidelity's Agent." (Cmplt. ¶ 60 n.3.)

7

of conduct or statements made in compromise negotiations is likewise not admissible.

FED. R. EVID. 408. By its terms, Rule 408 "renders inadmissible evidence of statements made in compromise negotiations if offered as an admission of the validity or invalidity of the claim or its amount under negotiation." *Raybestos Products Co. v. Younger*, 54 F.3d 1234, 1241 (7th Cir. 1995). To establish that Rule 408 applies to a particular communication, a defendant must make a "substantial showing" that it was, in fact, "part of a settlement attempt." *Id.* (quoting *New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910 F.2d 1474, 1482 (7th Cir. 1990)).

Defendants argue that Ginocchio's letter "was delivered to Fidelity by Defendants in connection with efforts to compromise claims and/or demands then being asserted by Fidelity." (Motion to Strike ¶ 3.) The first sentence of the letter states: "I have reviewed the above said letter [from Fidelity Vice-President Mike Fonder dated March 17, 2004] and recent letters from Mike Fonder making demands for premium remittances and cancellation of our long term agency agreement."[6] (Ex. E to Cmplt.) The last sentence of the letter states: "Once you have had the opportunity to review this response, I am more than willing to meet with you to discuss any of its contents as an attempt to settle or repair our relationship." (*Id.*) In Defendants' view, the letter constitutes an effort on the part of Defendants to settle or compromise Fidelity's claims and demands, which makes it inadmissible under Rule 408. Fidelity characterizes the motion to strike as an "evidentiary motion" and argues that it is premature because Defendants have not yet even answered the Complaint. (Pl. Resp., at 3.)[7]

Under FED. R. CIV. P. 12(f), a defendant may move to strike "any insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Motions to strike are disfavored and usually denied, *see Spearman Indus. Inc. v. St. Paul Fire and Marine Ins. Co.*, 109 F. Supp. 2d 905,

---

[6]     Plaintiff has not submitted copies of Fonder's letters to Fidelity or provided any detail as to their contents.

[7]     Fidelity National Title Insurance Company's Responses to Defendants' Five Motions Directed Against the Complaint is cited as "Pl. Resp., at __."

907 (N.D. Ill. 2000), but may be granted where "the allegations being challenged [are] so unrelated to plaintiff's claims as to be void of merit and unworthy of any consideration" and "so prejudicial to the movant." *National Organization for Women, Inc. v. Scheidler*, 897 F. Supp. 1047, 1087 n.28 (N.D. Ill. 1995). Defendants do not argue that the letter is redundant, immaterial, or scandalous, but only that it is inadmissible and prejudicial under Rule 408. Neither party has cited any cases addressing whether such an objection may properly be raised in a motion to strike.

At least one court has found that it may not. In *Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC*, 301 F. Supp. 2d 901 (W.D. Wis. 2003), the defendant moved to strike a letter attached to the complaint as redundant and immaterial under Rule 12(f), and as an inadmissible offer to compromise under Rule 408. *Id.* at 903. The court denied the motion to strike, finding, without explanation, that the defendant had not shown that the letter was redundant or immaterial. *Id.* at 904. "As to the Rule 408 argument," the court stated, "defendant may renew its objection if and when plaintiff attempts to use the letter as evidence." *Id.*

Other courts, however, have granted motions to strike based on Rule 408 where a contrary conclusion would undermine the Rule's purpose of encouraging settlement negotiations. In *Braman v. Woodfield Gardens Associates, Realcorp Investors I*, 715 F. Supp. 226 (N.D. Ill. 1989), for example, the court agreed to strike from the complaint a letter that proposed settlement of the parties' dispute. *Id.* at 230. The plaintiffs characterized the letter as an admission of liability, but the court disagreed, noting that "[b]y admitting such statements in the instant case, this court would undermine the purpose of Rule 408: to encourage settlements." *Id.*

In *RSL Holding Co. v. Dresser Indus., Inc.*, No. 89 C 7004, 1991 WL 203864 (N.D. Ill. Oct. 1, 1991), the plaintiffs sought to strike certain allegations in a counterclaim as inadmissible references to settlement negotiations under Rule 408. *Id.* at *4. The court noted that "courts in this district have not hesitated to strike allegations which violated Rule 408," but was unable to determine on the existing record whether the statements actually constituted settlement negotiations. *Id.* (citing *Braman*, 715 F. Supp. at 230). The court did not identify those statements, but in ruling on a later

motion to strike brought in connection with a motion for summary judgment, the court agreed that they did in fact fall within the terms of Rule 408. *RSL Holding Co. v. Dresser Indus., Inc.*, No. 89 C 7004, 1991 WL 277637, at *3 (N.D. Ill. Dec. 20, 1991). The court nonetheless declined to strike the statements to the extent that they were offered for purposes other than demonstrating that the plaintiffs' claim or defense was valid: "evidence regarding the negotiations is offered to demonstrate that the price proposed by RSL was significantly higher than the prices proposed by other insurance carriers." *Id.*

There is no dispute in this case that Fidelity intends to use the Ginocchio letter to establish the validity of its claims against Defendants. Indeed, Fidelity expressly alleges that by virtue of the April 12, 2004 letter, Defendants "have admitted that they are liable to Fidelity for the Losses associated with the Ken Steward Closings." (Cmplt. ¶ 41.) The only question is whether the letter constitutes evidence regarding settlement negotiations. Fidelity does not challenge Defendants' assertion that Ginocchio drafted the letter as "an attempt to settle or repair [the parties'] relationship." (Ex. E to Cmplt.) Instead, Fidelity insists that Rule 408 is inapplicable because the letter establishes that there is no "dispute" that Defendants owe Fidelity reimbursement for the Ken Steward claims. (Pl. Resp., at 4.) Specifically, Ginocchio wrote:

> The Ken Steward Claims:
> The demand for $535,073.00 for Law Title files number 124858E, 116403E, 128798E, 127620E and 129726E has also been referred to our E & O [errors and omissions] carrier. Law Title has also filed a law suit against Fifth Third Bank on the fraudulent endorsements contained in each of these files.
> It is my opinion that between Fifth Third Bank and our E & O carrier, Fidelity will get its money back on those files. I would ask you to please be patient.

(Letter from J. Ginocchio to P. Cozzi of 4/12/04, Ex. E to Cmplt.)

In support of this argument, Fidelity relies on *In re B.D. Int'l Discount Corp.*, 701 F.2d 1071 (2d Cir. 1983), in which Chase Manhattan Bank mistakenly credited B.D.I.'s checking account with a total of $7,268,745.92. *Id.* at 1072. Chase demanded repayment, and when settlement negotiations failed, filed an involuntary petition in bankruptcy seeking relief under Chapter 7 of the Bankruptcy Code. *Id.* At a trial held pursuant to § 303(h) of the Bankruptcy Code, Chase presented

10

financial statements of B.D.I. prepared by B.D.I.'s accountants containing the entry, "Payable to Bank $7,269,052." *Id.* at 1074. The Second Circuit found that the bankruptcy court properly considered this a "damaging admission" and rejected B.D.I.'s claim that the statement should have been excluded under Rule 408. "At the time of the negotiation B.D.I. did not dispute Chase's claim; it was simply endeavoring to get more time in which to pay." *Id.* at 1074 n.5. Specifically, Chase offered evidence of a telephone conversation during which the president of B.D.I. acknowledged to a bank executive "the accuracy of bank records which summarized and documented the three transactions that gave rise to the Chase claims but sought to arrive at a mutually satisfactory schedule of repayments." *Id.* at 1074.

In this case, Plaintiffs have not yet identified any evidence aside from the April 12, 2004 letter itself to suggest that Defendants agree with Fidelity's claims, and Defendants deny that the letter evidences any such agreement. Fidelity finds it significant that Defendants "filed lawsuits against third parties in an attempt to win money to fund its anticipated payments to Fidelity." (Pl. Resp., at 5; Cmplt. ¶ 42.) According to Defendants, however, they have a contractual right under their errors and omissions policy to have a defense provided to them for claims of negligence. (Def. Reply, at 3.)[8] The court does not believe that Defendants have somehow admitted negligence merely by turning over negligence claims to an insurer.

To the extent Fidelity (1) does not dispute that Ginocchio's April 12, 2004 letter was prepared in an effort to "settle or repair" the parties' relationship, (2) admits that it seeks to use the letter to establish Defendants' liability, and (3) has presented no indication that Defendants admit to owing money on the Ken Steward Closings aside from that letter, the court agrees that the letter is inadmissible under Rule 408. The motion to strike Exhibit E and paragraph 41 of the Complaint in which the letter is discussed and quoted is granted.

---

[8]     Law Title Insurance Company, Inc., Law Title Insurance Company, Inc. - Naperville and John F. Ginocchio's Consolidated Reply in Support of their Five Motions is cited as "Def. Reply, at ___."

**B. Motion to Dismiss Claims Against Ginocchio**

Ginocchio moves to dismiss the claims against him on the grounds that he did not personally guarantee the liability of Law Title or Law Title - Naperville. Ginocchio argues that the cover pages of both the Agreement and the Naperville Agreement fail to incorporate into the contracts the Personal Guarantees set forth in Schedules D, rendering his signature non-binding. With respect to the Agreement, Ginocchio also argues that he only signed the document containing the Schedule D Personal Guarantee in his capacity as President of Law Title.

**1. The Agreement**

The first page of the Agreement states:

The Schedules indicated below are attached and incorporated by reference:
[X]  Schedule A: Effective Date of Agreement, Agent's Territory, Liability Limit, Compensation, General Liability of Agent
[X]  Schedule B: Corporate Agent's Bond and Insurance Requirements
[X]  Schedule C: Attorney Agent's Bond and Insurance Requirements
[ ]  Schedule D: Personal Guarantee

(Ex. A1.) Ginocchio notes that Law Title received the Agreement from Fidelity with an "X" marked in the boxes corresponding to Schedules A, B, and C, but not in the box corresponding to Schedule D, the Personal Guarantee. In this way, Ginocchio argues, Fidelity evidenced its intent that the Personal Guarantee not be incorporated into the Agreement. This would seem to end the inquiry, except that the Schedules are all set forth on a single, pre-printed document "[a]ttached and made a part of the Agreement." (*Id.* at 5.) Ginocchio signed the Schedule document on June 2, 1997 as follows:

By LAW TITLE INSURANCE CO. INC.

_____
John F. Ginocchio, President

(*Id.*) In Ginocchio's view, this demonstrates that he signed the document only in a corporate representative capacity and, thus, did not personally guarantee the Agreement. (Ginocchio Motion ¶ 5.)

12

Under Ohio law, which both parties agree applies to the Agreement, when the "terms of an insurance policy are clear and unambiguous," the court must "appl[y] [them] to the facts without engaging in any construction." *Toledo-Lucas County Port Authority v. Axa Marine & Aviation Ins. (UK), Ltd.*, 368 F.3d 524, 530 (6th Cir. 2004) (quoting *Ledyard v. Auto-Owners Mutual Ins. Co.*, 137 Ohio App. 3d 501, 739 N.E.2d 1, 4 (8th Dist. 2000)). (*See also* Ginocchio Motion ¶ 6; Pl. Resp., at 8 n.4.) Ginocchio argues that the court need not look beyond the "X" marks and signature discussed above to determine that the Agreement clearly and unambiguously establishes that he gave no personal guarantee. (Ginocchio Motion ¶ 6.) Even if the contract terms are ambiguous, Ginocchio argues, the terms must be strictly construed against the drafter, Fidelity. (*Id.* ¶ 7 (citing *Toledo-Lucas County Port Authority*, 368 F.3d at 530) (where contract provisions are reasonably susceptible of more than one interpretation, the court must construe the terms "strictly against the insurer and liberally in favor of the insured").) *See also Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. Co.*, 210 F.3d 672, 685 (6th Cir. 2000) (an ambiguity in a contract "must be construed against the drafting party").

Fidelity responds that the mere fact that Ginocchio signed the Schedule document as "President" is insufficient to defeat the inference that the guarantee was personal. In support of this assertion, Fidelity first cites an Ohio case in which the court found no personal guarantee where an individual included the word "President" after his name. *Hursh Builders Supply Co. v. Clendenin*, No. 2002 CA 00166, 2002 WL 31002802, at *4 (Ohio Ct. App. Sept. 3, 2002). In reaching this conclusion, the court found it significant that the president did not also indicate the name of his principal, Amesburry Homes, Inc. *Id. See also S-S-C Co. v. Hobby Ctr.*, No. L-92-049, 1992 WL 355205, at *3 (Ohio Ct. App. Dec. 4, 1992) (noting that to avoid personal liability, "signer must not only disclose his agency status but must deal in the name of his principal, e.g., Beth B. Savino as President of Hobby Center, Inc."). *Hursh Builders Supply* does not support Fidelity's position in this case because unlike the president in that case, Ginocchio included both his title as President and the name of Law Title as part of his signature.

13

Fidelity next cites a myriad of cases from New York and Florida, relying primarily upon *Robert C. Malt & Co. v. Carpet World Distributors, Inc.*, 763 So.2d 508 (Fla. Dist. Ct. App. 2000). In *Robert C. Malt & Co.*, the parties entered into an agreement containing the following personal guarantee: "9. In the event the net worth of [Carpet World] is reduced in excess of ten percent (10%) . . . then it is agreed that Richard Susco shall guarantee the shortfall . . ." *Id.* at 509. Susco, the president of Carpet World, signed the document "CARPET WORLD DISTRIBUTORS, INC. By: /s/ Richard M. Susco Pres., Richard M. Susco President." *Id.* The court held that this sufficed to create a personal guarantee because a contrary conclusion "would nullify the specific language of paragraph nine." *Id.* at 510.

Ginocchio argues that unlike Florida, Ohio adheres to the principle that when there appears to be a discrepancy between the form of a promise and the form of a signature, the form of the signature controls. *See Marhofer v. Baur*, 101 Ohio App. 3d 194, 198, 655 N.E.2d 248, 251 (9th Dist. 1995). In *Marhofer*, company president Daniel E. Baur signed an agreement below the typed words "Courtesy Pontiac Olds, Inc." and next to the word "By." *Id.* at 196, 655 N.E.2d at 250. Baur's signature was followed by the designation "Pres." *Id.* Marhofer claimed that Baur should be personally liable despite having signed in his corporate capacity based on the following language in the agreement:

> MEMORANDUM OF AGREEMENT entered into this 14th day of June 1990, by and between John A. Marhofer, DBA, AUTOMOTIVE BUSINESS ASSOCIATES, of Cuyahoga Falls, Ohio (herein 'ABA'), Courtesy Pontiac Olds Inc. and Daniel E. Baur, its Pres; collectively, jointly and severally, 'SELLER.[']"

*Id.* at 197, 655 N.E.2d at 250. Following the principle that where there appears to be a discrepancy between the form of the promise and the form of the signature, the form of the signature controls, the court held that "[i]nasmuch as Baur only signed the agreement at issue as president of Courtesy, . . . he was entitled to judgment as a matter of law dismissing Marhofer's claim against him." *Id.* at 198, 655 N.E.2d at 251.

Like Baur, Ginocchio signed the document containing the Schedule D Personal Guarantee on behalf of Law Title and in his capacity as President. (Ex. A1, at 5.) Fidelity suggests that it is inconsistent to find that Ginocchio is not personally liable given that the Personal Guarantee states that Fidelity "shall not be required to exercise its remedy against [Law Title] before enforcing this undertaking against the undersigned, or any one of them." In Fidelity's view, "the obvious inference is that the 'undersigned' is signing independently of . . . Law Title." (Pl. Resp., at 9.) Fidelity also argues that Law Title already signed the Agreement on page 4 and therefore did not need to sign again as guarantor. (Id.) Under Ohio law, however, the form of the signature controls over any contrary conclusion arising from apparent discrepancies between the form of the promise and the form of the signature. Thus, Ginocchio is not personally liable under the Agreement. This conclusion is bolstered by the fact that Fidelity did not purport to incorporate Schedule D into the Agreement by checking the corresponding box on the first page of the document, while at the same time checking the boxes corresponding to the other three Schedules A, B, and C. As for Fidelity's reliance on *Robert C. Malt & Co.*, even assuming that case applied here, it is distinguishable because the paragraph containing the personal guarantee expressly named Richard Susco as the guarantor; Ginocchio, on the other hand, is not named in the Personal Guarantee. 763 So.2d at 509.

## 2. The Naperville Agreement

With respect to the Naperville Agreement, Ginocchio again argues that he is not personally liable because the Schedule D Personal Guarantee was not incorporated into that agreement. Like the Agreement, the Naperville Agreement contains the following language on its first page:

The Schedules indicated below are attached and incorporated by reference:
[ ] Schedule A: Effective Date of Agreement, Agent's Territory, Liability Limit, Compensation, General Liability of Agent
[ ] Schedule B: Corporate Agent's Bond and Insurance Requirements
[ ] Schedule C: Attorney Agent's Bond and Insurance Requirements
[ ] Schedule D: Personal Guarantee

(Ex. A2.) Unlike the Agreement, however, the Naperville Agreement contains no checkmarks in any of the boxes corresponding to the various Schedules. Nevertheless, the Naperville Agreement includes the Schedule document, signed by Ginocchio on February 1, 1997. This time, Ginocchio did not sign on behalf of Law Title - Naperville or provide his title of President. (Id. at 5.)

Ginocchio first notes that the Schedule document attached to the Complaint at Exhibit A2 modifies a January 3, 1994 agreement, and not the February 1, 1997 agreement to which it is appended. (Ginocchio Reply, at 7.) In fact, the Schedule document merely notes that the "Effective Date of [the] Original Agreement" was January 3, 1994; this reference to the date of the "original" agreement is consistent with Fidelity's contention that it was superseded by the later February 1, 1997 version attached to the Complaint. The court declines to dismiss Ginocchio on this basis.

Ginocchio next insists that the Personal Guarantee cannot be incorporated by reference in the absence of a checkmark in the corresponding box on the first page of the Naperville Agreement. In support of this argument, Ginocchio notes that under New York law, which the parties agree applies to the Naperville Agreement, "guaranty agreements are construed strictissimi juris . . . and . . . the court must protect a surety against any liability which is not strictly within the terms of the [guarantee] contract." (Id. (citing Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 188 F.3d 31, 34 (2d Cir. 1999) (quoting People v. Stuyvesant Ins. Co., 98 Misc. 2d 210, 214, 413 N.Y.S.2d 843, 847 (N.Y. Sup. 1979)).)

Fidelity argues that Ginocchio has essentially admitted that this theory is incorrect by acknowledging that New York law controls the Naperville Agreement as set forth in Schedule A, even though there is no checkmark in the box corresponding to that Schedule. (Pl. Resp., at 11.) Ginocchio responds that by its terms, the Naperville Agreement incorporates Schedule A in paragraphs 1, 4, and 6, but the same is not true of Schedule D. (Ex. A2 to Cmplt. ¶ 1 (referencing "Agent's Territory set forth in Schedule A"); ¶ 4 (referencing "gross Premiums as set forth in Schedule A"); ¶ 6 (stating "Agent's General Liability shall be as set forth in Schedule A . . . .").)

16

At this stage of the proceedings, the court declines to dismiss Ginocchio with respect to the Naperville Agreement. It is true that Fidelity did not check any boxes corresponding to the various Schedules, but the Schedule document nonetheless appears to be attached to the Naperville Agreement as "page 5 of 5." (Ex. A2.) Moreover, Ginocchio signed that Schedule document in his personal capacity and not on behalf of Law Title - Naperville. It may be that the parties only intended to incorporate the two Schedules mentioned elsewhere in the Naperville Agreement – Schedules A and B. (Id. ¶¶ 1, 4, 6, and 12(C) (referencing "the issuance of a Title Assurance without a Schedule 'B' exception.") Indeed, Ginocchio made handwritten modifications to the text of those two Schedules, but did not make similar changes to Schedules C or D. Such a determination, however, cannot be made at this stage, where Fidelity's allegations and the attached documents are construed in the light most favorable to Fidelity. Ginocchio's motion to dismiss claims against him relating to the Naperville Agreement is denied.

## C.     Motion to Dismiss Pursuant to Rules 9(b) and 19(a)

Defendants seek dismissal of Count I for failure to plead fraud with the specificity required by FED. R. CIV. P. 9(b), and for failure to join Ron Cook, a necessary party under FED. R. CIV. P. 19(a).

### 1.     Rule 9(b)

In Count I, Fidelity alleges "[u]pon information and belief" that Ron Cook and others "participated in a scheme to submit to Law Title forged and fictitious deeds and other false information in order to induce Fidelity, through Law Title, to issue and underwrite title insurance for the Ron Cook Closings." (Cmplt. ¶ 21.) Fidelity alleges that Law Title is required to reimburse Fidelity for amounts it paid pursuant to paragraphs 6(B)(5) and 6(C) of the Agreement "by virtue of Ron Cook's participation in the fraud." (Id. ¶ 26.) Defendants characterize these allegations as claims for fraud, and argue that Fidelity has not pleaded "the who, what, when, where and how: the first paragraph of any newspaper story" as required by Rule 9(b). DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).

17

Fidelity denies that Count I states a claim for fraud. Instead, Fidelity urges, Count I seeks

to recover against Law Title for breach of contract "due to the fact that their employee Ron Cook

acted improperly during the course of closings by participating in the fraud scheme with co-

conspirators Donna Davis, Carmondel Mohammad, and James Baiocchio [sic]." (Pl. Resp., at 12-

13.) Fidelity cites to paragraph 6(B)(5) of the Agreement, which provides:

B.    In the event that a Loss sustained or incurred for a matter arising under this
      Agreement resulted or arose from the negligent, willful or reckless conduct
      of Agent, Agent's employees or any independent contractor relied upon by
      Agent, then Agent shall reimburse [Fidelity] for the Loss. The instances
      where Agent shall be liable to [Fidelity] under this subparagraph shall include,
      without limitation, the following:

\* \* \* \*

5.    Commission of fraud, conspiracy, dishonesty, misrepresentation or
      defalcation by Agent or Agent's aiding and abetting therein.

(Ex. A1 ¶ 6.) According to Fidelity, Count I seeks indemnification from Law Title for the acts of Ron

Cook which violated this provision. "[S]imply because there are allegations of fraud directed against

third parties," Fidelity argues, "does not convert a breach of contract claim into a fraud claim." (Pl.

Resp., at 13 (citing *Tip Top Credit Union v. Cumis Ins. Security, Inc.*, No. 84-1794-C, 1989 WL

107752 (D. Kan. Aug. 10, 1989).)

The plaintiff in *Tip Top Credit Union* sought judgment against the defendant "for breach of

an indemnity insurance contract in not paying the losses caused by Tip Top's employees' failure to

faithfully perform their duties." 1989 WL 107752, at *1. The defendant sought judgment on the

pleadings in part due to the plaintiff's failure to allege with particularity the circumstances constituting

the fraudulent activities of one of those employees, a former Tip Top president and chief executive

officer. *Id.* at *4, 6. The court held that the requirements of Rule 9(b) did not apply to the complaint,

which asserted "only an action for recovery under an insurance contract covering the fraudulent and

dishonest acts of a non-party." *Id.* at *7 (citing *Federal Deposit Ins. Corp. v. Fidelity and Deposit

Co. of Maryland*, 118 F.R.D. 435, 436 (M.D. La. 1988)). As the court explained,

> Fraud is not the basis of such an action, and the purposes of Rule 9(b) are not
> served in these circumstances. In effect, defendant is seeking plaintiff to plead with
> particularity only the facts which trigger coverage under the policy.

*Id.*

Defendants do not cite any contrary authority, but insist that paragraph 6(B)(5) contemplates the commission of fraud, conspiracy, dishonesty, misrepresentation, or defalcation "*by Agent* or Agent's aiding and abetting therein." (Def. Reply, at 10) (emphasis in original.) In Defendants' view, this language demonstrates that Fidelity may only recover by alleging fraud on the part of Law Title, the "Agent" referenced in the Agreement. (*Id.* at 11.) Fidelity responds that liability attaches even if Ron Cook's actions constituted merely defalcation as opposed to fraud, and that "defalcation at the very minimum exists when Ron Cook writes checks outside of closing to their parties." (Pl. Resp., at 15.) Defendants note, however, that Fidelity has not alleged defalcation on the part of Cook or any other Law Title employee. (Def. Reply, at 11.)

The court is satisfied that Fidelity has adequately alleged that Law Title is liable to repay Fidelity for monies lost as a result of Ron Cook's fraudulent or otherwise improper underwriting practices. Fidelity's claim sounds in breach of contract based on the terms of the insurance Agreement. The mere fact that Fidelity must ultimately establish that Ron Cook's conduct triggers coverage under that Agreement does not mean that Fidelity has alleged, or must allege, a separate claim for fraud against Law Title itself, particularly where the Agreement provides for Law Title to indemnify Fidelity for misconduct less egregious than fraud. Defendants' motion to dismiss Count I on this basis is denied.

### 2. Rule 19(a)

Having determined that Fidelity has not alleged a claim for fraud, the court denies Defendants' motion for joinder of Ron Cook as a necessary party under Rule 19(a).

### D. Motion for Partial Summary Judgment

Defendants next seek partial summary judgment dismissing Law Title from Counts I, II and IV of the Complaint, and limiting Law Title's liability as to Count III. Defendants assert that Law Title

19

was involved in only one title insurance policy at issue in this case: Fidelity claim number 80654 (Law Title file number S11874) in the amount of $27,538.24, for which Fidelity seeks recovery in Count III of the Complaint. (Cmplt. ¶¶ 48(d), 49(d), 52(d).) All other title insurance policies, Defendants argue, involved only Law Title - Naperville. As a result, Defendants claim that Counts I, II and IV should be dismissed as against Law Title, and that Count III should be limited to state a claim against Law Title solely with respect to claim number 80654. Defendants acknowledge that unlike Counts II through IV, which Fidelity alleges in the alternative against both Law Title and Law Title - Naperville, Count I is alleged only against Law Title. Defendants nonetheless insist that Law Title - Naperville is the proper party to Count I and should replace Law Title in that regard. (Motion for S.J., at 1-2.) Fidelity responds that Defendants' motion is premature and that the facts do not yet conclusively establish the proper defendant as to any of Fidelity's claims.

### 1. Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. Where factual matters are in dispute, the court is required to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 802 (7th Cir. 2000).

### 2. Analysis

To support their position that, with the exception of claim number 80654, Law Title was not involved in any of the title insurance policies or closings identified in the Complaint, Defendants offer an affidavit to that effect from John Ginocchio. (Ginocchio Aff.; Statement of Facts ¶¶ 12, 13.)

20

Ginocchio claims that to the extent Fidelity's records differ, "any discrepancy was caused by Fidelity's failure to properly account for the name of the agency that issued the policies pursuant to the closings listed in Fidelity's complaint." (*Id.* ¶ 4.) Fidelity responds that it "lacks sufficient information to admit or deny" Defendants' assertion, and submits the affidavit of Richard P. Sulkowski, Vice President Associate Counsel of Fidelity, who claims that "the relevant closing documents and correspondence suggest to Fidelity that Law Title and, conversely not Law Title Naperville, conducted the disputed closings." (Sulkowski Aff. ¶¶ 1, 4; Response to Statement of Facts ¶¶ 12, 13.)

With respect to the Ron Cook Closings in Count I, for example, Sulkowski notes that HUD-1 and title commitments prepared with respect to Law Title file numbers 108021E and 110074E, identified in the Complaint at paragraphs 19(a) and 19(b), indicate that Law Title handled those closings. (Sulkowski Aff. ¶ 6; Group Ex. 1 to Sulkowski Aff.) Sulkowski also claims that Ginocchio's February 8, 2001 letter to Mike Fonder, drafted on Law Title letterhead, refers to Ron Cook as a Law Title employee. (Ex. 2 to Sulkowski Aff.) ("We have come across 7 files to date that may involve inappropriate underwriting on the part of our employee, Ron Cook . . . .")

As for Counts II through IV, Sulkowski states that it is unclear which corporate Defendant handled the relevant claims because "Law Title and Law Title Naperville blur the corporate lines between these two corporate entities." (Sulkowski Aff. ¶ 12.) By way of example, Sulkowski submits a HUD-1 statement prepared for Law Title file number 124858E, identified in the Complaint at paragraph 33(a), which, Sulkowski says, indicates that Law Title handled the closing. (Ex. 4 to Sulkowski Aff.) (identifying the "settlement agent" as Law Title Insurance Company, Inc.) Sulkowski also notes that a May 2, 2002 letter from Ginocchio notifying Northland Insurance Companies of "possible claims" under Law Title's errors and omissions policy relating to the Ken Steward Closings was drafted on Law Title letterhead. (Sulkowski Aff. ¶ 14.) Fidelity claims that "[t]he only reason why Fidelity added Law Title Naperville as a defendant [to Counts II through IV] is that Law Title

Naperville had filed litigation regarding certain of the claims that Fidelity thought belonged to Law Title." (Pl. Resp., at 20-21.)

Defendants move to strike many of Sulkowski's statements as speculative, conclusory, and immaterial. (Def. Reply, at 8.) They also submit a second affidavit from Ginocchio stating that Fidelity assigned Law Title - Naperville the agent code "IL2030," and that Fidelity assigned claim number 131911, identified in the Complaint at paragraph 33(f), to that agent code. (Ginocchio Aff. 2 ¶¶ 2, 3; Ex. 1 to Ginocchio Aff. 2, Memo from M. Fonder to C. Cidlik of 5/20/02; Ex. 2 to Ginocchio Aff. 2, Notice of Claim Received from W. Welch to M. Fonder.) The only evidence supporting Ginocchio's statement regarding the agent code, however, is a memo from Mike Fonder to someone named Cori Cidlik at Law Title - Naperville, regarding "Policy Inventory IL2030." (Ex. 1 to Ginocchio Aff. 2.) Nothing in the memo actually states that Law Title - Naperville is agent IL2030. In addition, Defendants have submitted evidence of only one claim file (131911) assigned to agent IL2030. Defendants state that they made a written request to Fidelity for additional documents but that Fidelity did not produce them. (Def. Reply, at 9 n.8.) Regardless, Defendants have not presented sufficient evidence at this stage of the proceedings to establish that Law Title - Naperville is the only proper defendant to Counts I, II, and IV, or that Law Title's involvement in Count III is limited to claim number 80654.

Defendants have produced a February 3, 1997 letter from Fidelity's Vice President & State Agency Manager Corey E. Miller addressed to Ron Cook at Law Title - Naperville, which does support Defendants' claim that Cook was a Law Title - Naperville employee. (Ex. 3 to Ginocchio Aff. 2.) In light of the other documentation discussed above, however, Fidelity has raised a question of fact as to whether Law Title was involved in at least some of the Ron Cook Closings identified in the Complaint. Defendants' motion for partial summary judgment is therefore denied. Defendants may renew the motion at a later date should additional evidence reveal that Law Title - Naperville is the proper party to Fidelity's claims.

**E.     Motion for More Definite Statement**

Defendants finally move for a more definite statement pursuant to FED. R. CIV. P. 12(e). Specifically, Defendants claim that (1) the Naperville Agreement is missing an exhibit; (2) Fidelity has not alleged facts regarding its practices and procedures as referenced in ¶ 2(A)(1) of the Agreement and the Naperville Agreement; (3) Fidelity has not identified all the closing files for which it seeks reimbursement in Count IV; and (4) Fidelity must plead facts demonstrating that it complied with the notice requirements set forth in ¶ 10 of the agreements.

Fidelity does not address these specific claims but argues generally that Rule 12(e) motions are disfavored and that it has "gone well-beyond Rule 8 notice pleading and Rule 12(e) in apprising Law Title of necessary facts regarding its breach of contract claim." (Pl. Resp., at 16-18) (citing *555 M Mfg., Inc. v. Calvin Klein, Inc.*, 13 F. Supp. 2d 719, 724 (N.D. Ill. 1998) ("In a contract dispute, a more definite statement is required when defendants can only guess as to what conduct and contract(s) [an] allegation refers.") (internal quotations omitted); *Mitchell v. E-Z Way Towers, Inc.*, 269 F.2d 126, 132 (5th Cir. 1959) ("In view of the great liberality of FED. R. CIV. P. 8, permitting notice pleading, it is clearly the policy of the Rules that Rule 12(e) should not be used to frustrate this policy by lightly requiring a plaintiff to amend his complaint which under Rule 8 is sufficient to withstand a motion to dismiss.").)

**1.     Exhibit I**

Schedule A of the Naperville Agreement references an "Exhibit I attached hereto and made a part thereof." The Complaint does not, however, include a copy of Exhibit I. Defendants have not shown that they are unable to understand or answer the Complaint in the absence of this document. *See Scott v. City of Chicago*, 195 F.3d 950, 952 (7th Cir. 1999) (a Rule 12(e) motion is proper where a claim is unclear and a defendant is unable to answer). Nevertheless, to the extent Fidelity does not directly dispute that it should be required to produce a complete copy of the Naperville Agreement, which includes Exhibit I, the court will grant Defendants' motion.

In their reply memorandum, Defendants also argue that Fidelity "should be required to attach the correct and complete four-part amendatory addendum to the Law Title - Naperville agreement." (Def. Reply, at 13.) Defendants claim that the Schedule document purports to amend a January 3, 1994 agreement, but that the Naperville Agreement attached to the Complaint as Ex. A2 is dated February 1, 1997. As noted, however, the Schedule document merely states that the "Effective Date of [the] Original Agreement" was January 3, 1994; this language is not inconsistent with Fidelity's assertion that the original agreement was superseded by the later February 1, 1997 version attached to the Complaint. In any event, "[a]rguments raised for the first time in a reply brief are waived." *Pugel v. Board of Trustees of Univ. of Illinois*, 378 F.3d 659, 669 (7th Cir. 2004) (quoting *James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998)). Defendants' request for dismissal due to Fidelity's failure to submit "the correct and complete four-part amendatory addendum" is denied.

### 2. Paragraph 2(A)(1)

Paragraph 11(I) of the Agreement and Naperville Agreement provides that the agreement "constitutes the entire agreement between the Parties with respect to the subject matter hereof . . . ." (Exs. A1 and A2 ¶ 11(I).) Paragraph 2(A)(1) of both agreements, however, states that

Agent shall receive and process applications for Title Assurances in accordance with the provisions of state law, in conformity with usual and customary practices and procedures, prudent underwriting principles and in full compliance with manuals, instructions, and bulletins of [Fidelity] from time to time given to Agent.

(Exs. A1 and A2 ¶ 2(A)(1).) Defendants argue that both agreements "contemplate[] rights and responsibilities established by course of dealings between Fidelity and the Law Title agents which are not defined by the agency agreements and which are not included by Fidelity in its complaint." (Rule 12(e) Motion ¶ 3.) Defendants claim that they should not be required to answer the Complaint without "a complete recitation by Fidelity of the agreements' scope and terms," including those referenced in paragraph 2(A)(1). (*Id.*)

24

In the court's view, this is more properly a matter for discovery than a Rule 12(e) motion. Indeed, "[t]o survive a Rule 12(e) motion on a contract claim, the plaintiff [need only] recite the relevant agreement, the basic contents of that agreement, and the pertinent parties." *555 M Mfg.*, 13 F. Supp. 2d at 724 (citing *Moore v. Fidelity Fin. Servs., Inc.*, 869 F. Supp. 557, 560-61 (N.D. Ill. 1994)). Fidelity has done so here and Defendants' motion as to this issue is denied.

### 3. Closing Files

Defendants next object that Fidelity has not yet identified all of the closing files for which it seeks relief in Count IV of the Complaint. Fidelity alleges that Defendants "conducted at least 6 closings on behalf of Fidelity," and that Fidelity is seeking "a minimum of $30,000 (or $5,000 per Loss) for th[ose] Miscellaneous ¶ 6(A) General Liability Closings." (Cmplt. ¶¶ 60, 64.) Defendants insist that "[i]f Fidelity believes there are more closings for which it is entitled to reimbursement, it should be required to accurately plead them." (Def. Reply, at 3.)

The court disagrees. Rule 8 requires only "a short and plain statement of the claim showing the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); *Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005). To satisfy this "short and plain statement" requirement, a plaintiff must allege "no more than 'the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer.'" *Brown*, 398 F.3d at 908 (quoting *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002)). Fidelity has identified six closing files it claims resulted in reimbursable losses, which is sufficient to put Defendants on notice of the claims against them. Should discovery reveal that there are claims involving additional closing files, as Fidelity suspects, Fidelity will be entitled to pursue those claims though they are not specifically identified in the Complaint. Defendants' motion for the identity of additional files at issue in Count IV is denied.

### 4. Notice

Defendants finally argue that Fidelity should be required to plead that it provided proper notice of its claims to Defendants under paragraph 10 of the Agreement and Naperville Agreement. Paragraph 10 provides:

> All notices permitted or required to be given under this Agreement shall be in writing
> addressed as shown below, and may be (i) personally delivered; or (ii) delivered by
> express courier service; or (iii) mailed by certified or registered United States Mail.

(Exs. A1 and A2 ¶ 10.) Defendants claim that under New York law, which governs the Naperville

Agreement, "claims for indemnification require the giving of notice as expressly stated in the

contract between the parties." (Rule 12(e) Motion ¶ 6) (citing *Unigard Security Ins. Co. v. North*

*River Ins. Co.*, 79 N.Y.2d 576, 581, 594 N.E.2d 571, 573 (1992) ("[T]he notice provision for a

primary insurer operates as a condition precedent . . . .").) In Defendants' view, the notice provision

in the Naperville Agreement should be deemed a condition precedent to the filing of suit: "The notice

provisions serve to allow the agencies to financially account for contingent liabilities and to correct

possible administration problems within the agencies which could give rise to future title insurance

claims and which could be avoided through compliance with the agreement's notice provisions."

(Rule 12(e) Motion ¶ 7.) As for the Agreement, Defendants argue in a footnote that though Ohio

law, which governs the Agreement, "appears not to have the same 'condition precedent' rule as

does New York," the Agreement's "notice provisions create a contractual duty on the part of Fidelity,

the compliance with which Fidelity should be required to plead." (*Id.* ¶ 9 n.6.)

Fidelity does not directly deny any of these assertions, which has prompted Defendants to

ask that the motion be converted to a Rule 12(b)(6) motion to dismiss. (Def. Reply, at 14.)

Defendants do not indicate what specific notice they believe is required under the Agreement or the

Naperville Agreement, nor do they deny having received such notice. The court found only two

paragraphs in the agreements that even mention notice: (1) paragraph 7, which requires Defendants

to notify Fidelity of claims, litigation, and administrative proceedings (Exs. A1 and A2 ¶ 7) ("Agent

shall immediately notify [Fidelity] if Agent becomes aware of" any claim, judicial action or

proceeding, or administrative hearing); and (2) paragraph 8, which requires notice to terminate the

agreement. (*Id.* ¶ 8.) Fidelity need not allege compliance with paragraph 7 to the extent it

addresses notice requirements applicable to Defendants. In any event, Defendants have certainly

received notice that Fidelity now claims the Agreement and Naperville Agreement have been

breached, and there is no evidence at this stage of the proceedings that those agreements have been terminated. Thus, even assuming Fidelity were required to plead notice in this case, the court is satisfied that the Complaint is sufficient in that regard.

## CONCLUSION

For the reasons stated above, Defendants' motions are granted in part and denied in part as follows: Defendants' motion to strike Exhibit E (Docket No. 8) is granted, but their motions to dismiss pursuant to Rules 9(b) and 19(a) (Docket No. 11), and for partial summary judgment (Docket No. 10) are both denied. Ginocchio's motion to dismiss (Docket No. 12) is granted as to the Agreement but denied as to the Naperville Agreement. Finally, Defendants' motion for a more definite statement (Docket No. 9) is granted in part and denied in part as stated in this opinion.

ENTER:

Dated: May 3, 2005

REBECCA R. PALLMEYER
United States District Judge

27